DOWD, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

| | |
|---|---|
| James Miller, ) | |
| ) | CASE NO. 3:04 CV 7203 |
| Plaintiff(s), ) | |
| ) | |
| v. ) | MEMORANDUM OPINION |
| ) | |
| Reliance Standard Life Insurance Company, ) | |
| ) | |
| Defendant(s). ) | |
| ) | |

On April 20, 2004, plaintiff James Miller filed this lawsuit pursuant to the Employee Retirement Income Security Act of 1974 ("ERISA") challenging the defendant's denial of long-term disability ("LTD") benefits under an ERISA plan supplied by Miller's employer. On September 13, 2004, the case was transferred to the docket of the undersigned.

Pursuant to the procedure set forth in <u>Wilkins v. Baptist Healthcare System, Inc.</u>, 150 F.3d 609, 619 (6th Cir. 1998) (Gilman, J., concurring), the parties have filed their respective briefs (Doc. Nos. 13, 14, 16) and the entire administrative record (Doc. No. 12),[1] along with supplements requested by the Court (Doc. Nos. 18, 19, 20). The matter is ripe for determination. For the reasons set forth below, the Court concludes that defendants' denial of LTD benefits under the "any occupation" standard of the Plan was arbitrary and capricious.

---

[1] This record is practically incomprehensible because it contains no Table of Contents to guide the user. The Court has had to guess what these documents are and how the various pages fit together. For future reference, defendant should compile the record with a detailed Table of Contents identifying discrete documents by page numbers.

(3:04 CV 7203)

## I. BACKGROUND

In May 1990, plaintiff began working for GAB Robins as a Claims Adjuster. (Administrative Record ["AR"] 230). This position is characterized as "light work." (AR255).[2]

Miller began experiencing back pain and underwent surgery on a herniated disk in 1997. (AR066). He was able to continue his position as a Claims Adjuster until April 9, 2000, when back and right leg pain forced him to stop working. (AR227-28; 277). On June 12, 2000, in a second major surgery on his back, he had three discs removed (decompression lumbar laminectomy), some bone taken off his left hip, and two rods inserted into his back (fixation and fusion of the L4-5 and L3-4 vertebrae). (AR066; 222; 258).

In October 2000, Miller applied for LTD benefits under a Plan offered by his employer, issued and underwritten by defendant Reliance Standard Life Insurance Company ("RSL"), and administered by defendant Matrix Absence Management, Inc. ("Matrix") (Compl. ¶¶ 8, 11). The Plan provided benefits in two stages: (1) for disability from one's "regular occupation" or what is referred to as "own occupation" and (2) for disability from "any occupation." (AR011). Under the Plan, after twenty-four (24) months of "own occupation" disability, the disability claim would be re-evaluated and LTD benefits would continue only if the employee was disabled from "any occupation." (AR011).

---

[2] The actual GAB Robins job description, which contains no specification of any exertion level, is at AR236-37. For Social Security disability purposes, the job of "claims adjuster" is classified as "light work" which is defined as "[u]p to 20 Lbs. occasionally, up to 10 Lbs. frequently, or negligible amount constantly." (AR255).

(3:04 CV 7203)

On October 18, 2000, Matrix notified Miller that his application for benefits under the "own occupation" standard had been granted, effective October 7, 2000. (AR245-47).[3] Not long after, on November 16, 2000, his neurosurgeon, Dr. Sig Stephensen, stated that Miller was "[un]able to return to his regular job in the future [because] . . . he is totally and permanently disabled." (AR235). Miller continued to receive LTD benefits under the "own occupation" standard until about January 7, 2003.

On January 29, 2003, Matrix notified Miller that his benefits were discontinued because he did not meet the "any occupation" standard and because he could perform the following jobs: Customer Complaint Clerk, Information Clerk, Collector, Shopping Investigator, and Investigator. The first two jobs are classified as "sedentary" and the other three as "light." (AR079-80). The two-page letter notifying Miller of this decision contains no reasoning to substantiate the decision -- it simply declares: "Our review has concluded that you are no longer entitled to disability benefits from your policy." (AR079).

Miller administratively appealed this discontinuance of benefits. His appeal and claim for permanent benefits was denied on May 20, 2003. (AR055-058). The denial letter repeated that Miller was capable of performing the same five jobs that had been identified in the original denial, plus a sixth job: Insurance Clerk.

On April 24, 2005, Miller filed this lawsuit asserting that the Plan's denial of LTD benefits was contrary to medical evidence and without medical support and, therefore, arbitrary and capricious.

---

[3] On September 8, 2000, the plan administrator's reviewer had indicated that it was "reasonable for [Miller] to continue out of work" and that "[a] minimum of 3 month recovery is acceptable." (AR259).

3

(3:04 CV 7203)

## II.  DISCUSSION

### A.  Standard of Review

This Court would generally review an administrator's denial of benefits de novo.  See Wilkins, 150 F.3d at 613.  However, when the ERISA plan expressly provides discretion to the administrator in making eligibility decisions, the reviewing court employs the arbitrary and capricious standard of review.  See Williams v. Int'l Paper Co., 227 F.3d 706, 711 (6th Cir.2000) (citing Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 110-12 (1989)).

In this case, it is undisputed that the Plan administrator had discretionary authority to determine eligibility for benefits.  (See AR016).  Therefore, the arbitrary and capricious standard applies.

The arbitrary and capricious standard is the "least demanding form of judicial review of administrative action."  McDonald v. Western-Southern Life Ins. Co., 347 F.3d 161, 169 (6th Cir.2003) (internal citations and quotations omitted).  A decision is not arbitrary and capricious "when it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome."  Williams, 227 F.3d at 712 (internal quotation omitted).

### B.  Analysis

The focus of this Court's review is the letter from RSL to Miller dated May 20, 2003, wherein he was denied "any occupation" LTD disability benefits.  The denial letter must be viewed in light of the information before the Plan administrator at the time of the denial.  See Administrative Record (Doc. No. 12).

(3:04 CV 7203)

The denial letter stated that the Quality Review Unit had "reviewed documentation from [Miller's] physician, Dr. Katherine Johnson and the functional capacities evaluation conducted on December 10, 2002, and on December 11, 2002." (AR056). RSL noted that Dr. Johnson remarked on March 4, 2003 that Miller had "increased tenderness . . . along the spinal column, a lot of muscle spasms[;]" that he could bend forward only 10 degrees, backward not at all, and had difficulty flexing side to side; that he could walk on his toes for only a couple steps and could not walk on his heels; that he had muscle weakness; and that he complained of pain. (AR056). Dr. Johnson's notes also indicate that Miller declined epidural steroid injections out of fear that these would permit him to do the very activities that caused his injury. Dr. Johnson indicated that, although she understood Miller's apprehension, "we need to convince him that sometimes these things can help . . . but right now at this time I do not think he can work and as I told him I would do whatever I could within a reasonable amount to help him get the Disability but again as I told him my exam is limited by what he can show me." (AR056).

RSL concluded that "Dr. Johnson's suggestion [that Miller is in a great deal of pain and is incapable of working] does not correspond with the results of the functional capacities evaluation . . . ." (AR056). It was further noted that

> (1) although Miller subjectively complained of pain, there was no corresponding increase in heart rate, which would be expected when a person is in pain;
>
> (2) that Miller was capable of performing continuous standing and reaching below the shoulders, occasional sitting, walking, climbing of stairs and reaching above the shoulders;

5

(3:04 CV 7203)

>  (3) that Miller had a sedentary exertion level with an ability to lift up to 10 pounds of force occasionally, and/or a negligible amount of force frequently; and
>
>  (4) that Miller was capable of using his upper extremities for occasional simple grasping, fine manipulation, pushing, pulling, feeling and tactile sensation.

(AR057).

The denial letter concluded:

> We acknowledge that you may suffer from some intermittent tenderness or discomfort. However, the extent of your pain appears to be subjective in nature. In addition, we were able to identify numerous occupations corresponding with the restrictions and limitations you demonstrated during the functional capacities evaluation. Thus, it was once again concluded that you no longer met the group policy's definition of "Total Disability." As a result, the original decision to terminate benefits is supported.

(AR057).

## 1. Rejection of Plaintiff's Complaint of Pain

Plaintiff argues that the physical therapist who conducted the functional capacity evaluation ("FCE") failed to give proper weight to actual relevant pain symptoms simply because when Miller "report[ed] a subjective increase in pain . . . physiologically the heart rate would not demonstrate a significant increase." (AR109). The therapist noted that plaintiff "would demonstrate physical signs such as grabbing his back, walking around when the pain level increased during activities[, but] the heart rate would show [only] minimal increase with increased pain level." (AR110).

Plaintiff asserts that, because defendants have supplied no medical evidence or other documentation "in support of the absolute co-existence of increased heart [rate] with pain[,]" (Doc.

6

(3:04 CV 7203)

No. 13 at 3), the rejection of his subjective complaints of pain was arbitrary and capricious, especially in view of the fact that plaintiff did exhibit "minimal increase" in his heart rate and had a history of back problems.

In a footnote, plaintiff cites *Pain Clinical Updates - International Association for the Study of Pain*, Vol. III, Issue 2, 1995, for the proposition that although "[h]eart rate is an easy and generally valid measure of short, sharp pain[,] . . . there appear to be no biological measures that can be recommended for use as a clinical pain measure for longer-term pain." (Doc. No. 13 at 5, n.2). Defendants challenge this information as being "outside the record" and, therefore, not to be considered. Defendants cite Perry v. Simplicity Engineering, 900 F.2d 963, 967 (6th Cir. 1990), which noted that "[t]he de novo standard of review, like the . . . .arbitrary and capricious standard, does not mandate or permit the consideration of evidence not presented to the administrator." In making that statement, the Perry court was commenting on the lack of factual evidence of Perry's disability.[4] Perry can be distinguished.

The defendants here challenges plaintiff's use of this medical journal as if, without it, there would be no good reason to reject defendants' unfounded conclusion that plaintiff does not experience pain simply because he had only a "minimal increase" in his heart rate at the time he complained of

---

[4] Specifically, the court stated: "Absolutely no evidence was submitted to the administrator indicating that Perry was totally disabled during the time he had coverage, as the plan requires, whether his coverage ended April 25 or July 31. The only evidence about a date of disability indicated that Perry was disabled as of January 3, 1986." 900 F.2d at 967.

7

(3:04 CV 7203)

pain.[5] It seems to this Court to be highly subjective to decide that only pain that is severe enough to cause "significant increase" in heart rate can be disabling pain. Defendants offer nothing to show that it is a medically-accepted conclusion that a minimal increase in heart rate is insufficient to establish pain in a person who has a history of back problems, including two major surgeries, one of which involved fixation and fusion of vertebrae and insertion of rods.

That having been said, it does appear that Miller's medical records suggest that there is potential for improvement in his condition. As far back as November 16, 2000, his neurosurgeon, Dr. Stephensen, wrote a letter to Dr. Leonard Smith, apparently a referring physician, indicating that although Miller complained of "severe lower back pain and right radicular leg pain, . . . he does not want to pursue any further investigations to try to get to the bottom of this." (AR186). The doctor noted: "He would rather just live with the pain. He does not see any way that he can return to work, and so he has decided to pursue a total and permanent disability status." (AR186). Dr. Stephensen reported that they had "reached a therapeutic impasse." (AR186). After a two-month follow-up visit, on February 15, 2001, Dr. Stephensen again wrote to Dr. Smith stating that Miller had "less pain" and was being helped by physical therapy. (AR185). Finally, by letter dated July 10, 2001, Dr. Stephensen again reported to Dr. Smith that Miller was "get[ting] through the day without any

---

[5] Interestingly, the physical therapist's Functional Capacity Evaluation Summary Report stated both that Miller "gave maximum, consistent effort" and "continually limited himself in activities[.]" She noted that he "limited himself by exhibiting pain behavior that was not consistent on a physiological basis." In particular, she noted that when Miller complained of pain, "physiologically the heart rate would not demonstrate a significant increase." (AR109, emphasis added). The Summary Report also stated, under the "Vitals/Pain Behavior" caption that Miller's "heart rate would show minimal increase with increased pain levels." (AR110, emphasis added).

(3:04 CV 7203)

significant amount of pain medication or muscle relaxants." (AR184). Dr. Stephensen reported that he had recommended one of two courses of action: (1) "further investigation to try to determine the source of [Miller's] ongoing pain," which would involve a myelogram and a CT scan, and (2) a pain management consultation. However, Miller was opposed to both suggestions. In fact, Dr. Stephenson noted that Miller "simply refuses to participate in this plan." (AR184).

There are no significant medical records from this July 10, 2001 letter until March 4, 2003. On that date, Miller went to his family doctor, Dr. Katherine Johnson, for a checkup because of back pain. In her office notes, Dr. Johnson wrote that when she enters the treatment room "he's always standing, he's pacing back and forth and he seems and I feel he's in a great deal of discomfort." (AR074). She further commented: "I don't think this is an act, I don't think he putting on." (AR074). After conducting an examination, Dr. Johnson stated in her notes: "I don't think he can work. I just absolutely don't feel so and I don't know what the [Administrative Law] Judge wants really." (AR075).[6] Dr. Johnson advised that "the best thing to do would be to get Dr. Stephenson to see if [he] can help us[.]" (AR075). In the conclusion of this examination report, Dr. Johnson noted: "Chronic low back pain which I believe is quite severe, in fact it's one of the worst cases that I've seen with sciatica involving the right leg especially which is giving him limited ability to bend over, move, walk on his toes, his heels." (AR076). Dr. Johnson also mentioned that Miller had seen Dr. Torma, an anesthesiologist, who wanted to do epidurals to relieve Miller's pain. Miller was "leery about doing it"

---

[6] The reference to the ALJ was that Miller had applied for but been denied Social Security Disability Benefits.

9

(3:04 CV 7203)

because "he was just afraid of it, of the needle going into the back and of the medication, how it would make him feel and he was afraid that it would make him feel so good that it would just allow him to do things more and that he would really injure himself[.]" (AR076). She concluded by commenting that "we need to convince him that sometimes these things can help[.]" (AR076).

Although the Court is perfectly willing to accept that constant pain, even though it only causes a minimal increase in the heart rate, could indeed be disabling, the fact that both Dr. Stephenson and Dr. Johnson, who had treated Miller over a length of time, seemed to believe there were treatments that could help him but which he resisted, suggests that it was not arbitrary and capricious for the Plan administrator to ultimately conclude that Miller was not truly disabled due to pain.

All that having been said, even if Miller were not disabled <u>due to pain</u>, he might still be disabled if his capabilities make it impossible for him to work under the "any occupation" standard.

**2. Identification of Jobs Which Plaintiff Could Perform**

In the original January 29, 2003 denial letter, RSL concluded that plaintiff "would qualify for the following occupations: Customer Complaint Clerk, Collector, Shopping Investigator, Investigator, and Information Clerk." (AR080). In the final denial letter of May 20, 2003, the job of "Insurance Clerk" was added. (AR057).

This determination was based, at least in part, on the Functional Capacity Evaluation that had been performed by a physical therapist at the Plan's behest.

10

(3:04 CV 7203)

### a. Plaintiff's Challenge to Purported "Core Contradictions" in the FCE

Plaintiff first argues that the draft version of the FCE summary report that was faxed for purposes of review to Heather DiFalco on January 10, 2003, was different from another one that was re-faxed on January 16, 2003. The first one purportedly contained a statement that Miller had demonstrated consistency of performance in three ways:

1. Performance was consistent among FCE items;
2. Functional limitations noted were consistent with physical impairments identified;
3. Client's perceived abilities were consistent with those objectively evaluated in the FCE.

As the source of this quotation, plaintiff points to AR101, which is nothing more than a fax cover sheet. Plaintiff argues that this three-fold listing was removed from the report when it was re-faxed and points to AR091 as authority for this assertion. AR091, like AR101, is nothing but another fax cover sheet. It is impossible, due to the lack of a Table of Contents accompanying this Record, to tell which pages go with each fax cover sheet.[7]

AR109 does contain the three-fold list that plaintiff cites. However, in the phrase introducing the list, the report says: "<u>Ms. Hill</u> demonstrated consistency of performance in the FCE in the following

---

[7] At first glance, the few pages following AR101 appear to be the FCE and the few pages following AR091 appear to be sheets that may be making corrections. It is really not clear.

After the Court took the time to turn through every page of the Record and found no FCE Summary Report that seemed to be complete, it ordered defendants to submit a supplement, with an affidavit, identifying what parts of the record make up the FCE relied upon by the Plan administrator when making its determination to deny benefits. Defendants submitted the affidavit of Patricia Wallace, the person who sent the facsimile transmissions evidenced by AR091 and AR101, who confirmed that AR 093-094 and AR102-110 together make up the complete FCE. See Doc. No. 18, Wallace Aff. ¶ 6.

11

(3:04 CV 7203)

three ways:" (AR109). Therefore, this Court still cannot conclude that the FCE in the record actually pertains to Miller. It appears to be a report that is mixing Miller's results with the results of somebody named "Ms. Hill." It is possible that this is a mere clerical error and the threefold list does apply to Miller; but there is no way to know.[8]

It is difficult to determine what, if any, advantage to the plaintiff there would be if this threefold list is either <u>applied</u> or <u>not applied</u> to him. The significance of "consistency of performance" is simply not addressed by anyone.

In the Court's view, this portion of plaintiff's "core contradictions" argument is a red herring. Even though the Court does not believe that the section on page AR109 captioned "Consistency of Performance" can be definitively determined to apply to Miller, the Court does not believe that any error in the report can be characterized as "arbitrary and capricious."

Plaintiff also argues that there is a "core contradiction" in the FCE with respect to his ability to stand. The Physical Capacities Questionnaire indicates that he can stand "continuously 67% -100%" (AR093), but the FCE Form indicates that he "shifts frequently, [and is] unable to stand still" (AR108), and the FCE Summary Report indicates that he has a "significant deficit[ ]" in standing (AR110). All three of these reports were completed by the same physical therapist. This inconsistency was apparently resolved against Miller when, in the denial letter, RSL declared that Miller was "capable of performing continuous standing[.]" (AR057).

---

[8] It is equally conceivable that the person completing the report was using the FCE of Ms. Hill as a sort of template for Miller's FCE Report and just forgot to delete the matters that applied to Ms. Hill. Maybe this threefold list has nothing to do with Miller.

12

(3:04 CV 7203)

This bears strongly on the five (or six) jobs which RSL found plaintiff capable of performing, at least three of which are classified as "light exertion" jobs. Jobs that "require[ ] walking or standing to a significant degree" are classified as "light work," according to the vocational expert consulted by the defendants, even where they may also require lifting only negligible amounts of weight. (AR083).

The defendants argue here that "[n]o where does it state that [Miller] was unable to stand" (Doc. No. 14 at 12), but only that he shifts frequently while standing. Of course, that ignores the statement that he is "unable to stand still." Whether or not this would make a difference in the end, it appears that RSL simply resolved this contradiction against the plaintiff, declaring in the May 20, 2003 denial letter that he is "capable of performing continuous standing" (AR057), even though tests show that he is not.

It is also interesting to note that Miller's original job as a "Claims Adjuster" is classified as "light exertion" and he was deemed disabled from that job. Therefore, it is difficult to understand how he would be able to do other light exertion jobs.

This portion of plaintiff's "core contradictions" argument is well taken. In the face of the contradictory conclusions about plaintiff's ability to stand, it was arbitrary and capricious to decide, without attempting to reconcile this contradiction, that plaintiff is capable of "light exertion" jobs which require significant amounts of standing.

13

(3:04 CV 7203)

### b.  Plaintiff's Challenge to the Conclusion that He Can Do a Full Range of Sedentary Work

Plaintiff also argues that he cannot do the sedentary jobs that RSL identified.  "Sedentary" jobs require the ability to exert[ ] up to 10 pounds of force occasionally and/or a negligible amount of force frequently to lift, Carey, [sic] push, pull, or otherwise move objects[.]"  (AR083).

The Physical Capacities Questionnaire indicates that Miller can grasp, push/pull, perform fine manipulations, and perceive tactile sensations only occasionally, which is characterized as "33% or less."  (AR094).  He cannot do these functions "frequently" even if the weight were negligible.

Furthermore, during the FCE performed in December 2002, Miller could not lift any weight in a floor to waist lift, was able to lift five pounds in a waist to overhead lift only 1%-5% of an 8-hour workday, three pounds only 6%-33% of a workday, and zero pounds continuously for a workday.  He was able to carry five pounds only 1%-5% of an 8-hour day, two pounds only 5%-33% of the day, and zero pounds continuously for a workday.  He was able to front carry only two pounds for 1%-5% of an 8-hour workday, and zero pounds for 6%-100% of a workday.  (AR 107-108).  At no time did he exhibit an ability to manage ten pounds.

Despite the results of his FCE, in the denial letter of May 20, 2003, RSL concluded that Miller has "a sedentary exertion level with an ability to lift up to 10 pounds of force occasionally, and/or a negligible amount of force frequently."  (AR057).  This conclusion is completely inconsistent with the test results.  Therefore, it was arbitrary and capricious to conclude that Miller is capable of performing a full range of sedentary work.

(3:04 CV 7203)

### 3. Defendants' Failure to Conduct an Independent Medical Examination

Plaintiff's final argument is that defendants failed to have an IME conducted even though two individuals from RSL had recommended an IME by a spine specialist. (AR122, 132). By itself this would not constitute arbitrary and capricious action on the part of defendants. There is no requirement that an IME be conducted. In this case, it might have been advisable, but this Court is not willing to conclude as a matter of law that it is arbitrary and capricious to fail to conduct an IME when the same has been recommended by someone in the Plan's organization.

In addition, this issue has less significance in view of the fact that the Court has already concluded that the denial of benefits was arbitrary and capricious because it is not supported by the tests that were conducted.

### III. CONCLUSION

The Court has carefully examined the record that was before the Plan administrator when it denied Miller LTD benefits under the "any occupation" standard and concludes that the denial was arbitrary and capricious because it is not "possible to offer a reasoned explanation, based on the evidence, for the [denial of benefits]." Accordingly, the Court will enter final judgment in favor of the plaintiff and will direct that Long-Term Disability benefits under the relevant ERISA Plan be awarded.

IT IS SO ORDERED.

  June 6, 2005                                          *s/ David D. Dowd, Jr.*
Date                                                    David D. Dowd, Jr.
                                                         U.S. District Judge